IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Bankruptcy Court
Southern District of Texas
FILED

SEP 0 9 2004

Michael N. Milby, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff-Respondent, | § | |
| | § | |
| V. | § | CRIMINAL ACTION NO. H-00-683 |
| | § | CIVIL ACTION NO. H-03-1680 |
| FRANCISCO JOSE | § | |
| VILLAGRA-MONTALVAN | § | |
| | § | |
| Defendant-Movant. | § | |

## MEMORANDUM AND RECOMMENDATION
## DENYING MOVANT'S § 2255 MOTION TO VACATE
## SET ASIDE OR CORRECT SENTENCE
## AND GRANTING THE UNITED STATES' MOTION
## TO DISMISS

Before the Magistrate Judge in this federal habeas corpus proceeding pursuant to 28 U.S.C.

§ 2255 is Movant Francisco Jose Villagra-Montalvan's § 2255 Motion to Vacate, Set Aside or

Correct Sentence (Document No. 30)[1] and the United States' Answer and Motion to Dismiss

(Document No. 36). After reviewing Movant Francisco Jose Villagra-Montalvan's Motion, the

Government's Answer and Motion to Dismiss, the record of the proceedings before the District

Court in the underlying criminal case, and on appeal, and the applicable law, the Magistrate Judge

RECOMMENDS, for the reasons set forth below, that Movant Francisco Jose

---

[1] Villagra's Motion to Vacate, Set Aside or Correct Sentence can be found at Document No. 1 in civil Action H-03-1680 and at Document No. 30 in Criminal Action H-00-683. References hereafter will be to the Criminal Docket numbers unless otherwise indicated.

Villagra-Montalvan's § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No. 30) be DENIED, and the United States' Motion to Dismiss (Document No. 36) be GRANTED.

## I.    Procedural History

Movant, Francisco Jose Villagra-Montalvan ("Villagra-Montalvan"), who is currently in the custody of the United States Bureau of Prisons, is seeking federal habeas corpus relief under 28 U.S.C. § 2255. This is Villagra-Montalvan's first attempt at § 2255 relief.

On October 4, 2000, Villagra-Montalvan was charged in a two count indictment. Count one charged Villagra-Montalvan with possession with intent to distribute heroin in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(i). Count two of the indictment charged Villagra-Montalvan with importing heroin into the United States from a place outside of the United States in violation of 21 U.S.C. §§ 952(a) and 960(b)(1)(A).[2] (Document No. 1). On December 1, 2000, Villagra-Montalvan pleaded guilty to both counts, without a written Plea Agreement. (Document No. 7; Transcript of Rearraignment Hearing, Document No. 23). Prior to sentencing, a Pre-sentence Investigation Report ("PSR") was prepared, to which Villagra-Montalvan filed written objections.[3] (Document Nos. 11, 10). A final PSR was filed on March 9, 2001, pursuant

---

[2] The minimum and maximum penalty for possession with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(i) is ten years to life imprisonment. The minimum and maximum penalty for importation of heroin, in violation of 21 U.S.C. §§ 952(a) and 960(b)(1)(A) is ten years to life imprisonment.

[3] Villagra-Montalvan objected to not being awarded a four level downward sentencing adjustment based on his minimal participant role in the offense. According to Villagra-Montalvan, because he was only a courier for a single smuggling transaction, which involved a small amount of heroin, he should have been given the four level adjustment.

to which Villagra-Montalvan's sentence was calculated as follows: In calculating Villagra-Montalvan's base offense level, Villagra-Montalvan was held accountable for the distribution of 3.945 kilograms of heroin, which under U.S.S.G. § 3D1.2(d) directs a base offense level of 34; (2) because Villagra-Montalvan's base offense level was greater than 26, and he met the criteria set forth in U.S.S.G. § 5C1.2, his base offense was reduced by two levels, for an adjusted offense level of 32. (3) Because Villagra-Montalvan accepted responsibility for his criminal conduct and informed the government of his desire to plead guilty in a timely manner under U.S.S.G. § 3E1.1(a) and (b), his offense level was reduced by three levels, for an adjusted offense level of 29.[4] (4) With a total adjusted offense level of 29, and with a criminal history category of 1, Villagra-Montalvan had a guideline sentence range of 87 to 108 months. On March 9, 2001, Villagra was sentenced to 87 months incarceration on both counts, each running concurrently, to be followed by concurrent three year terms of supervised release. (Document No. 13; Transcript of Sentencing Hearing, Document No. 27, p. 10). The Court imposed a $200 special assessment and waived fines. (Document No. 13; Transcript of Sentencing Hearing, Document No. 27, pp. 11-12). Judgment was entered on March 20, 2001. (Document No. 14). On April 9, 2001, Villagra-Montalvan filed a Notice of Appeal with the Fifth Circuit Court of Appeals. The judgment of the District Court was affirmed. (Document Nos. 28, 29). The Fifth Circuit Court of Appeals held that, because Villagra-Montalvan's uncorroborated statements made during a

---

[4] Villagra-Montalvan in a verbal statement stated that "he was told by individuals that he would be paid $4,000 for importing the heroin via the carry-on bag. He also said he feared for his family's safety if he backed out of the deal. Later, he said he was tricked, and he was not paid. The defendant said he feels bad about the offense, especially since the United States allowed him to work and have a family here." (Document No. 11, ¶ 9).

safety-valve debriefing were not offered as evidence of Villagra-Montalvan's role in the offense, the District Court did not err in not considering the statements; and because Villagra-Montalvan had not submitted the issue in his appellate brief, he waived consideration of whether the District Court erred at sentencing by finding that Villagra-Montalvan was a minor or minimal participant in the drug trafficking activities. (Document No. 29). The mandate issued on July 11, 2002. (Document No. 28). On May 16, 2003, Villagra-Montalvan filed a § 2255 Motion to Vacate, Set Aside, or Correct Sentence within one year of his conviction being final. (Document No. 30). The Government has filed an Answer and a Motion to Dismiss. (Document No. 36). This § 2255 proceeding is ripe for ruling.


## II.    Issues Presented

Villagra-Montalvan raises three claims in this § 2255 proceeding:

1.    that his conviction was obtained by use of evidence gained pursuant to an unconstitutional search and seizure, where his baggage was searched in an airport without a warrant, and he acted under duress when he allowed Customs agents to search his baggage;

2.    that his plea was unknowing and involuntary, and made under duress and coercion, where he did not have comprehension of the English language, did not understand the American legal system, was not fully apprised of the repercussions of his acts through a meaningful colloquy with the Court, and felt compelled to plead guilty based on a fear for the safety of his family in Nicaragua; and

3.    that his counsel was ineffective for failing to adequately investigate the nature and circumstances of the offense, contest the search and seizure, interview adverse witnesses, contest lab results, contest inaccuracies in the PSR, and move for a reduction based upon minimal participation.

(Document No. 30). The United States, in response, contends that because Villagra-Montalvan

4

failed to raise his first two claims (grounds one and two) on direct appeal and has not either demonstrated cause and prejudice to overcome the procedural bar, or claimed he was actually innocent, those claims are procedurally barred from review herein. With respect to Villagra-Montalvan's third claim, the United States contends that he failed to demonstrate that his counsel's actions fell below an objective standard for reasonableness, and that the outcome would have been different "but for" any such sub-standard actions. Attached to its Answer and Motion, the United States has provided an affidavit from Raquel K.Wilson, Villagra-Montalvan's counsel. (Document No. 36, Attachment A). With respect to Villagra-Montalvan's allegations that she failed to investigate the nature and circumstances of the offense, failed to contest the lawfulness of the search and seizure, failed to interview adverse witnesses, failed to contest laboratory reports, and failed to challenge the PSR and request a minor role reduction based on his status as a "mule," Ms. Wilson states:

1.    Response to Allegation that Asst. Federal Public Defender Raquel K. Wilson Provided Ineffective Assistance of Counsel

I, Raquel K. Wilson, represented Mr. Villagra at all stages of the proceedings in district court. These proceedings included: a preliminary and detention hearing, held on September 14, 2000, before the Honorable Judge Mary Milloy; arraignment, held on October 12, 2000, before the Honorable Judge Marcia Crone; rearraignment, held on December 1, 2000, before the Honorable Judge Melinda Harmon; and sentencing, held before the Honorable Judge Melinda Harmon on March 9, 2001.

Before the start of each court proceeding I met with Mr. Villagra to ensure that he understood the proceeding that was about to take place. While Mr. Villagra expressed dissatisfaction with the potential sentence, at no time did he appear confused as to the stage or purpose of the proceedings.

I met with Mr. Villagra on numerous occasions at the Federal Detention center to discuss his case. In addition, on numerous occasions, I spoke with Mr. Villagra by phone regarding his case. Finally, I met with him along with

investigator Juan Hernandez on more than one occasion. Mr. Hernandez also accepted numerous phone calls from Mr. Villagra and spoke with him about his case on each occasion.

A.    Failure to Investigate the Nature and Circumstances of the Offense

During the pendency of the case, one of Mr. Villagra's main concerns was that the people responsible be punished. To this end, Mr. Villagra gave me very detailed accounts of how he came to be involved in drug trafficking. Mr. Villagra described with particularity where he was taken to pick up the suitcase with the drugs secreted in a hidden compartment, who took him to pick up the drugs, and how he was taken to the airport and kept under vigilance to ensure that he did not try to abscond with the drugs. While Mr. Villagra insisted that he wasn't sure what type of drug was hidden inside the suitcase, he strongly suspected that drugs must have been inside the suitcase, given all the circumstances surrounding his trip. I informed Mr. Villagra that it would be difficult, if not impossible to investigate the case in the manner he desired, because the people allegedly involved in drug smuggling in Nicaragua would not likely admit their involvement in a crime to our investigator. In addition, such investigation would not bear fruit as a defense at trial, since none of the details he provided pointed to his innocence, and since the government could prove his guilt by deliberate ignorance, if necessary. Nonetheless, I had numerous interviews with Mr. Villagra at the Federal Detention Center, wherein Mr. Villagra gave a detailed account of how he came to be involved in the offense. I also reviewed several long letters Mr. Villagra wrote to me describing the offense.

On Mr. Villagra's request and the request of his family, I contacted an attorney in Nicaragua named Yanira Cordoba. Ms. Cordoba spoke with me about the Villagra family's circumstances, especially the severe illness of Mr. Villagra's mother. At the request of Mr. Villagra and his family, I also contacted an attorney in Nicaragua named Walter Gutierrez. Mr. Gutierrez had practiced in the United States and had some familiarity with federal criminal procedure. I sought Mr. Gutierrez's assistance in starting an investigation into the people who involved Mr. Villagra in the offense. Mr. Gutierrez had no insights other than to advise that I stress to United States Customs the importance of doing a follow-up investigation on the detailed information Mr. Villagra provided at the safety valve debriefing. This was something I was already doing. I generally updated Mr. Gutierrez on Mr. Villagra's case and invited his assistance. Mr. Gutierrez offered no further assistance.

I also reviewed discovery provided by the government. The discovery included investigative reports, documents seized from Mr. Villagra, and photographs of the suitcase, hidden compartment, and drugs.

After review of all the evidence, I advised Mr. Villagra that his best option was to plead guilty and cooperate with authorities in the hopes of receiving a motion for downward departure for substantial assistance, or a safety-valve discount. Either option would avoid the ten-year minimum mandatory sentence. Mr. Villagra felt that he should not be held responsible for the crime because he had fought for the United States as a Contra in Nicaragua, and therefore, this country owed him. In addition, Mr. Villagra felt that the drug traffickers in Nicaragua had tricked him. Once Mr. Villagra realized what he was doing, he was too afraid to say anything to the customs agents at the airport. In the end, Mr. Villagra agreed to plead guilty, but he was never satisfied with the potential range of punishment, or with the fact that I could not guarantee that he would receive a mitigating role adjustment.

B.     Failure to Contest the Lawfulness of the Search and Seizure

Mr. Villagra told me and investigator Juan Hernandez that he was threatened into confessing to the crime at the airport. He stated, at times, that one or more United States Customs agents held a gun to his head and get him to confess, and that he confessed out of fear. Neither my investigator nor I found his story credible. During each time Mr. Villagra related what happened, certain crucial facts changed. In one telling, Mr. Villagra said that the agents held guns to his head. In another telling, Mr. Villagra did not mention guns, but said that the agents threatened to call the drug dealers in Nicaragua and give them information on the whereabouts of his family so that they might be harmed. At any suppression hearing, Mr. Villagra would have to have testified, and I believed that he would be exposed to loss of acceptance of responsibility at sentencing, possible loss of safety valve, and a possible sentencing enhancement for obstruction of justice. I advised Mr. Villagra that there was no basis to challenge the search in his case, given that the search took place at an international border, and that his claim of physical threats was not credible. For these reasons, in my professional judgment, a challenge to the search was not prudent.

C.     Failure to Interview Adverse Witnesses

I cross examined United States Customs Agent Tanya Cook at the preliminary and detention hearing held on September 14, 2000. After the hearing and before Mr. Villagra's plea of guilty, I reviewed investigative reports by Agent Cook, who had taken Mr. Villagra's statement upon his arrest. In my professional judgment, no further interviews were necessary.

D.     Failure to Contest Lab Results

I did not contest the DEA lab results showing that the substance Mr.

Villagra imported was heroin. Mr. Villagra never challenged that fact and never asked me to do so.

E.      Failure to Challenge the Presentence Report and Request a Minor Role Reduction Based on "Mule" Status

On February 28, 2001, I filed objections to the PSR clarifying factual inaccuracies in the report. In addition, I requested a four-level downward adjustment pursuant to USSG § 3B1.2, arguing that Mr. Villagra was a minimal participant. Attached to the objections were approximately eighteen documents that I had translated from Spanish. The documents included letters sent to me by Mr. Villagra's family in Nicaragua, and by his common law wife, Veronica Cortez, in Miami. I also attached family photographs. The purpose of attaching these photographs and documents to the objections was to convince the court that Mr. Villagra had no prior contact with the criminal justice experience, that he was a fine, upstanding citizen who had used poor judgment in one instance, and that he deserved a mitigating role adjustment. Nonetheless the court denied the mitigating role adjustment.

Immediately after sentencing, I spoke with Mr. Villagra privately. I advised him that it was unlikely that the Court of Appeals would grant him a minimal participant adjustment if he appealed. Mr. Villagra said that he did not wish to appeal the case. Therefore, I did not file a notice of appeal.

(Document No. 36, Attachment A).


III.    **Discussion**

**A. Procedurally Barred Claims**

Pursuant to 28 U.S.C. § 2255, a federal prisoner may challenge his conviction on the basis

that his "sentence was imposed in violation of the Constitution or laws of the United States, or

that the court was without jurisdiction to impose such sentence, or that the sentence was in excess

of the maximum authorized by law, or is otherwise subject to collateral attack." Motions brought

pursuant to § 2255 are reserved for claims of constitutional or jurisdictional significance. *United*

*States v. Capua*, 656 F.2d 1033, 1037 (5th Cir. 1981); *Limon-Gonzalez v. United States*, 499

F.2d 936, 937 (5th Cir. 1974).

When claims of constitutional or jurisdictional import are not raised on direct appeal, the claims are procedurally defaulted, and can only be considered in a § 2255 proceeding if a movant can show both cause for his failure to raise his claims on appeal, and actual prejudice resulting from the alleged errors. *United States v. Placente*, 81 F.3d 555, 558 (5th Cir. 1996) ("[A] defendant who raises a constitutional or jurisdictional issue for the first time on collateral review must show both cause for his procedural default and actual prejudice due to any such errors."); *United States v. Gaudet*, 81 F.3d 585, 589 (5th Cir. 1996) ("When raising issues of jurisdictional or constitutional magnitude for the first time on collateral review, a defendant ordinarily must show both cause for his procedural default and actual prejudice resulting from the error."); *United States v. Acklen*, 47 F.3d 739, 741-42 (5th Cir. 1995) ("Because a challenge under section 2255 may not do service of an appeal, a movant may not raise constitutional or jurisdictional issues for the first time on collateral review without establishing both cause for his procedural default and actual prejudice resulting from the error."); *United States v. Shaid*, 937 F.2d 228, 232 (5th Cir. 1991) ("A defendant can challenge his conviction after it is presumed final only on issues of constitutional or jurisdictional magnitude, and may not raise an issue for the first time on collateral review without showing both cause for his procedural default, and actual prejudice resulting from the error."). Alternatively, procedurally defaulted claims can be considered for the first time in a § 2255 proceeding if the movant can show that he is actually innocent. *Bousley v. United States*, 523 U.S. 614, 622 (1998) ("Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either cause or actual prejudice, or that he is actually innocent."). Actual innocence

means "factual innocence, not mere legal insufficiency." *Bousley*, 523 U.S. at 623. Simply put, to overcome a procedural default based on actual innocence, the movant "must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Id.*

### 1.    Unknowing and Involuntary Plea

Villagra-Montalvan claims his plea of guilty was submitted unknowingly and involuntarily, and made under duress and coercion. Facts offered by Villagra-Montalvan to support his claim include: his status as a Nicaraguan, who did not read, write, or understand English; he had no understanding of the American legal system; he felt compelled to plea guilty because he feared harm would befall his family in Nicaragua; he did not understand the options available to him; he did not understand the nature and circumstances of the charges against him; he did not understand his rights; he did not understand the consequences of his plea; and the court failed to ascertain whether he understood his circumstances and was making a knowing and voluntary plea. (Document No. 30).

At the December 1, 2000 Rearraignment, the Court engaged in an extended colloquy to ensure that Villagra-Montalvan understood the charges against him, the maximum penalties, the rights he was waiving, and the factual basis of his plea. The court also advised Villagra-Montalvan that his sentence could not be determined until a pre-sentence investigation had been completed, and that Villagra-Montalvan could not withdraw his guilty plea if he determined that he did not like the sentence imposed by the Court. At the Rearraignment, with the assistance of an interpreter, the following colloquy took place:

Court:        Have you received a copy of the indictment pending against you,

|              | that is, the written charges that have been brought against you in this case? |
|--------------|---------------------------------------------------------------------------|
| Defendant:   | Yes, Your Honor. |
| Court:       | And have you discussed this -- those charges and the case in general with Ms. Wilson, your attorney. |
| Defendant:   | Yes. |
| Court:       | Are you fully satisfied with the counsel, representation and advice given to you in this case by Ms. Wilson as your attorney? |
| Defendant:   | Yes.  I'm very thankful with her. |
| Court:       | And I understand this plea is not -- there's no plea agreement; is that correct? |
| Counsel:     | That's correct. |
| Court:       | Mr. Villagra Montalvan, do you understand -- or let me ask you this: Has anyone made any promises to you or assurances to you in an effort to get you to plead guilty in this case? |
| Defendant:   | No. |

(Defendant conferring with attorney)

| Defendant:   | No.  I'm sure about the mistake I committed. |
|--------------|---------------------------------------------------------------------------|
| Court:       | No.  Okay.  I understand that, but I just need to find out if anybody's promised you anything?  In other words, I promise you this if you'll plead guilty to this crime?  Has anybody said anything like that to you? |
| Defendant:   | No, Your Honor. |
| Court:       | And has anyone in any way attempted to force you to plead guilty in this case? |
| Defendant:   | No, Your Honor. |
| Court:       | Are you pleading guilty because you are guilty? |

Defendant:       Yes, I am guilty.  Yes.

Court:            Do you understand that the offense to which you are pleading guilty
                 is a felony offense, and that if your plea is accepted, you will be
                 adjudged guilty of that offense and such adjudication may deprive
                 you of valuable civil rights, such as the right to vote, the right to
                 hold public office, the right to serve on a jury, and the right to
                 possess firearms?

Defendant:       Yes, Your Honor.

                          *  *  *

Court:            Do you understand that a finding of guilt in this case may result in
                 your being deported from the United States?

Defendant:       Yes.  I understand that.

Court:            I want to talk to you now about the penalties you're facing . . . .
                 You are pleading guilty to Count 1 . . . and the penalty for that
                 crime is not less than 10 years and not more than life in prison
                 and/or a fine not to exceed $4 million.  You are also pleading guilty
                 to importing a controlled substance.  Imprisonment for that is also
                 not less than 10 years and not more than life in prison and/or a fine
                 not to exceed $4 million. . . . And along with that supervised
                 release there would be certain conditions of supervised release that
                 you would have to follow. . . . And there would be a one-hundred
                 dollar special assessment for each of the two counts which, would
                 mean a total of $200 in special assessment.

                 Do you understand that all of those taken together -- the
                 imprisonment, the fine, the supervised release, the conditions of
                 supervised release and the special assessment -- those are the
                 maximum possible penalties you're facing as a result of your plea
                 of guilty this morning?

Defendant:       I understand, Your Honor.

                          *  *  *

Court:            [T]here is what is known as mandatory minimum . . . I would have
                 to give you at least 10 years in prison.  Do you understand?

| | |
|---|---|
| Defendant: | Yes, I understand. |

* * *

| | |
|---|---|
| Court: | Have you and Ms. Wilson talked about how those [sentencing] guidelines may apply in your case? |
| Defendant: | Yes, we have talked about that. |
| Court: | Do you understand that I do not know today what your sentence will be? |
| Defendant: | Yes, Your Honor. |

* * *

| | |
|---|---|
| Court: | All right. It may be that at the time of sentencing, the sentence I give you is more severe than the one that you and Ms. Wilson might have estimated that you think you might get. Do you understand that? |
| Defendant: | Yes, Your Honor. |
| Court: | And if the sentence is more severe than the one that you are expecting to get, you will not be given a chance to withdraw your plea of guilty. Do you understand that? |
| Defendant: | Yes, Your Honor. |

* * *

| | |
|---|---|
| Court: | Do you also understand that parole has been abolished and that if you're sentenced to prison, you will not be released on parole? |
| Defendant: | Yes, Your Honor. |
| Court: | Do you also understand that under some circumstances you or the government would have the right to appeal any sentence that I impose? |
| Defendant: | Yes, Your Honor |

(Transcript of Rearraignment, Document No. 23, pp. 4-10).

When a defendant faces imprisonment following a plea of guilty, the court is required to ensure that defendant understands the plea and the consequences of that plea. *Boykin v. Alabama*, 395 U.S. 238, 243-44 (1969); *U.S. v. Perez*, 918 F.2d 488, 490 (5th Cir. 1990). Accordingly, the record must reflect that the defendant was fully informed of, and understands, his Constitutional rights, and was "specially instructed on the rights and privileges which he waived by entering the guilty plea." *Perez*, 918 F.2d at 490; *see* Fed. R. Crim. P. 11(b). In a collateral attack, a movant such as Villagra-Montalvan must prove more than a technical error in the court's application of Rule 11; the movant "must show a reasonable probability that, but for the error, he would not have entered the plea." *United States v. Benitez*, 124 S. Ct. 2333, 2340 (2004). Additionally, "an adequate understanding of the English language is a threshold requirement for a voluntary plea." *Perez*, 918 F.2d at 490. To this end, translators are provided for Defendants such as Villagra-Montalvan who are not proficient in their use and understanding of the English language to ensure the defendant fully comprehends the proceedings. *See id.*; 28 U.S.C. § 1827(d)(1).

Given Villagra-Montalvan's statements on the record, which carry a strong presumption of verity, *Blackledge v. Allison*, 431 U.S. 63, 74 (1977), that he understood the statutory and constitutional rights that he waived, that he understood the possible range of punishment and how his sentence would be computed, Villagra-Montalvan has not shown that his plea was not counseled, knowing and voluntary. Villagra-Montalvan's suggestion that his inability to read, write, or understand English contributed to his unknowing and involuntary plea is belied by the record since the proceedings were translated into his native tongue by an interpreter. The record does not show that Villagra-Montalvan's comprehension of the proceedings was in any way

affected by his native language not being the English language, and Villagra-Montalvan offers no additional evidence of how a language barrier might have encumbered his comprehension of the proceedings. Nor has he shown that his plea was compelled by fear of harm to his family in Nicaragua.

Because Villagra's guilty plea was knowingly, voluntarily, and intelligently entered, he is not entitled to relief on this claim. Further, Villagra-Montalvan is procedurally barred from bringing this claim in a § 2255 motion because he did not demonstrate cause and prejudice associated with failing to bring the claim on direct appeal; nor has he made any showing of actual innocence.

### 2.    Unconstitutional Search and Seizure

Villagra-Montalvan claims that his conviction was obtained by the use of evidence that was gained through an unconstitutional search and seizure. Facts offered by Villagra-Montalvan to support this claim indicate: a search of Villagra-Montalvan's possessions was executed without a warrant; he is a Nicaraguan national who does not read, write, or speak English; he is not aware of the legal procedures in the United States; the officers that executed the search did not speak Spanish; the officers did not request permission to search Villagra-Montalvan's possessions; and Villagra-Montalvan, based on personal experiences as a Contra Soldier in Nicaragua feared figures of authority, carrying weapons, and based on his life experiences felt compelled to comply with the demands of the officers. (Document No. 30).

Villagra-Montalvan did not raise the unconstitutional search and seizure claim in his direct appeal; accordingly, that claim is procedurally defaulted, and can now only be considered in this § 2255 motion if Villagra-Montalvan can show both cause for his failure to raise this claim on

appeal, and actual prejudice resulting from the alleged errors. *See Placente*, 81 F.3d at 558;

*Gaudet*, 81 F.3d at 589; *Acklen*, 47 F.3d at 741-42; *Shaid*, 937 F.2d at 232. Here, Villagra-

Montalvan maintains that counsel's ineffectiveness is the "cause" for his failure to raise his fourth

amendment claim on direct appeal. Villagra-Montalvan, however, cannot establish that counsel's

failure to consent the search on appeal prejudiced him – that is, that the result of the appeal

would have been different. According to counsel's sworn affidavit, the decision not to raise the

claim on direct appeal was based on the following:

> Mr. Villagra told me and investigator Juan Hernandez that he was threatened into
> confessing to the crime at the airport. He stated, at times, that one or more United
> States Customs agents held a gun to his head to get him to confess, and that he
> confessed out of fear. Neither my investigator nor I found his story credible.
> During each time Mr. Villagra related what happened, certain crucial facts
> changed. In one telling, Mr. Villagra said that the agents held guns to his head.
> In another telling, Mr. Villagra did not mention guns, but said that the agents
> threatened to call the drug dealers in Nicaragua and give them information on the
> whereabouts of his family so that they might be harmed. At any suppression
> hearing, Mr. Villagra would have to have testified, and I believed that he would
> be exposed to loss of acceptance of responsibility at sentencing, possible loss of
> safety valve, and a possible sentencing enhancement for obstruction of justice. I
> advised Mr. Villagra that there was no basis to challenge the search in his case,
> given that the search took place at an international border, and that his claim of
> physical threats was not credible. For these reasons, in my professional judgment,
> a challenge to the search was not prudent. (Document No. 36, Attachment A, pp.
> 4-5).

Upon this record, the search and seizure claim is procedurally defaulted because Villagra-

Montalvan failed to bring the claim on direct appeal, and has not demonstrated cause for failing

to raise the issue on appeal, actual prejudice or his actual innocence. Moreover, even assuming

that the claim was not procedurally barred, Villagra-Montalvan's unconditional guilty plea, which

was knowing and voluntary, waived all non jurisdictional defenses. *Tollett v. Henderson*, 411

U.S. 258, 267 (1973) ("[A] guilty plea represents a break in the chain of events which has

preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea."); *Norman v. McCotter*, 765 F.2d 504, 511 (5th Cir. 1985) ("Illegal searches and seizures are nonjurisdictional defects" that are waived when a defendant enters "knowing and voluntary guilty plea.")

## B. Ineffective Assistance of Counsel

Villagra also claims ineffective assistance of counsel. Facts alleged in support this claim include his counsel failure to: adequately investigate the nature and circumstances of the offense, contest the search and seizure, interview adverse witnesses, contest lab results, contest inaccuracies in the PSR, object to the PSR, and move for a reduction based upon minimal participation. (Document No. 30).

Claims of ineffective assistance of counsel are generally measured by the standard of *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a petitioner must be able to show that his counsel was deficient and that the deficiency prejudiced him to the extent that a fair trial could not be had. *Strickland*, 466 U.S. at 687. Deficiency is judged by an objective reasonableness standard, with great deference given to counsel and a presumption that the disputed conduct is reasonable. *Id*. at 687-88. The prejudice element requires a petitioner to prove that absent the disputed conduct of counsel, the outcome would have been both different and more favorable. *Id*. at 694-95. Under *Strickland*, a petitioner must establish both deficiency and prejudice prongs to be entitled to habeas relief. The failure to establish either deficient performance or prejudice makes it unnecessary to examine the other prong. *United States v.*

*Seyfert,* 67 F.3d 544, 547 (5th Cir. 1995).

Under the deficiency prong of *Strickland,* judicial scrutiny of counsel's performance is "highly deferential" and "a strong presumption" is made that "trial counsel rendered adequate assistance and that the challenged conduct was the product of reasoned trial strategy." *Wilkerson v. Collins,* 950 F.2d 1054, 1064-65 (5th Cir. 1992), *cert. denied,* 509 U.S. 921 (1993) (citing *Strickland*). To overcome the presumption of competence, the petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland,* 466 U.S. at 690. Under the prejudice prong of *Strickland,* a petitioner must be able to establish that absent his counsel's deficient performance, the result of his trial could have been different. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691.

Constitutionally effective assistance of counsel under *Strickland* is not errorless counsel. The determination of whether counsel has rendered reasonably effective assistance turns on the totality of facts in the entire record. Each case is judged in light of the number, nature, and seriousness of the charges against a defendant, the strength of the case against him, and the strength and complexity of his possible defense. *Baldwin v. Maggio,* 704 F.2d 1325, 1329 (5th Cir. 1983), *cert. denied,* 467 U.S. 1220 (1984). The reasonableness of the challenged conduct is determined by viewing the circumstances at the time of that conduct. *Strickland,* 466 U.S. at 690. "We will not find inadequate representation merely because, with the benefit of hindsight, we disagree with counsel's strategic choices." *Kitchens v. Johnson,* 190 F.3d 698, 701 (5th Cir. 1999) (quoting *Green v. Johnson,* 116 F.3d 1115, 1122 (5th Cir. 1997)). Conclusory allegations

of ineffective assistance of counsel do not raise a constitutional question in a federal habeas petition. *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000), *cert. denied*, 531 U.S. 849 (2000) (citing *Barnard v. Collins*, 958 F.2d 634, 642 (5th Cir. 1992); *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983)).

Here, upon this record, Villagra cannot show that he was prejudiced within the meaning of *Strickland* by his counsel's performance, and therefore his ineffectiveness of counsel claims fail. Villagra-Montalvan alleges no details in support of his claim that counsel failed to investigate the offense; failed to consent the search; failed to interview adverse witnesses; failed to contest lab results; failed to challenge the PSR; and failed to request a sentencing reduction based on his mule states. All of the facts suggested by Villagas are uncorroborated or unsupported, conclusory allegations, and are insufficient to raise a cognizable ineffectiveness of counsel claim. *Miller v. Johnson*, 200 F.3d at 282.

With respect to Villagra-Montalvan's claim that counsel was ineffective for failing to investigate the offense, Villaga-Montalvan fails to identify what, if anything, such an investigation would have disclosed. According to the affidavit submitted by Villagra-Montalvan's counsel, the matter was thoroughly investigated, and the investigation included interviews not only with Villagra-Montalvan but interviews with his family in Nicaragua, and a review of discovery provided by the government. Villagra-Montalvan's counsel states in her affidavit:

> During the pendency of the case, one of Mr. Villagra's main concerns was that the people responsible be punished. To this end, Mr. Villagra gave me very detailed accounts of how he came to be involved in drug trafficking. Mr. Villagra described with particularity where he was taken to pick up the suitcase with the drugs secreted in a hidden compartment, who took him to pick up the drugs, and how he was taken to the airport and kept under vigilance to ensure that he did not try to abscond with the drugs. While Mr. Villagra insisted that he wasn't sure

what type of drug was hidden inside the suitcase, he strongly suspected that drugs must have been inside the suitcase, given all the circumstances surrounding his trip. I informed Mr. Villagra that it would be difficult, if not impossible to investigate the case in the manner he desired, because the people allegedly involved in drug smuggling in Nicaragua would not likely admit their involvement in a crime to our investigator. In addition, such investigation would not bear fruit as a defense at trial, since none of the details he provided pointed to his innocence, and since the government could prove his guilt by deliberate ignorance, if necessary. Nonetheless, I had numerous interviews with Mr. Villagra at the Federal Detention Center, wherein Mr. Villagra gave a detailed account of how he came to be involved in the offense. I also reviewed several long letters Mr. Villagra wrote to me describing the offense.

On Mr. Villagra's request and the request of his family, I contacted an attorney in Nicaragua named Yanira Cordoba. Ms. Cordoba spoke with me about the Villagra family's circumstances, especially the severe illness of Mr. Villagra's mother. At the request of Mr. Villagra and his family, I also contacted an attorney in Nicaragua named Walter Gutierrez. Mr. Gutierrez had practiced in the United States and had some familiarity with federal criminal procedure. I sought Mr. Gutierrez's assistance in starting an investigation into the people who involved Mr. Villagra in the offense. Mr. Gutierrez had no insights other [than] to advise that I stress to United States Customs the importance of doing a follow-up investigation on the detailed information Mr. Villagra provided at the safety valve debriefing. This was something I was already doing. I generally updated Mr. Gutierrez on Mr. Villagra's case and invited his assistance. Mr. Gutierrez offered no further assistance.

I also reviewed discovery provided by the government. The discovery included investigative reports, documents seized from Mr. Villagra, and photographs of the suitcase, hidden compartment, and drugs.

After review of all the evidence, I advised Mr. Villagra that his best option was to plead guilty and cooperate with authorities in the hopes of receiving a motion for downward departure for substantial assistance, or a safety-valve discount. Either option would avoid the ten-year minimum mandatory sentence. Mr. Villagra felt that he should not be held responsible for the crime because he had fought for the United States as a Contra in Nicaragua, and therefore, this country owed him. In addition, Mr. Villagra felt that the drug traffickers in Nicaragua had tricked him. Once Mr. Villagra realized what he was doing, he was too afraid to say anything to the customs agents at the airport. In the end, Mr. Villagra agreed to plead guilty, but he was never satisfied with the potential range of punishment, or with the fact that I could not guarantee that he would receive a mitigating role adjustment.

Likewise, Villagra-Montalvan's counsel disputes Villagra-Montalvan's assertion that she should

have contested the lawfulness of his search and seizure, failed to interview witnesses, and failed

to contest laboratory reports. Counsel states in her affidavit with respect to these allegations:

> Mr. Villagra told me and investigator Juan Hernandez that he was threatened into confessing to the crime at the airport. He stated, at times, that one or more United States Customs agents held a gun to his head and get him to confess, and that he confessed out of fear. Neither my investigator nor I found his story credible. During each time Mr. Villagra related what happened, certain crucial facts changed. In one telling, Mr. Villagra said that the agents held guns to his head. In another telling, Mr. Villagra did not mention guns, but said that the agents threatened to call the drug dealers in Nicaragua and give them information on the whereabouts of his family so that they might be harmed. At any suppression hearing, Mr. Villagra would have to have testified, and I believed that he would be exposed to loss of acceptance of responsibility at sentencing, possible loss of safety valve, and a possible sentencing enhancement for obstruction of justice. I advised Mr. Villagra that there was no basis to challenge the search in his case, given that the search took place at an international border, and that his claim of physical threats was not credible. For these reasons, in my professional judgment, a challenge to the search was not prudent.
>
> I cross examined United States Customs Agent Tanya Cook at the preliminary and detention hearing held on September 14, 2000. After the hearing and before Mr. Villagra's plea of guilty, I reviewed investigative reports by Agent Cook, who had taken Mr. Villagra's statement upon his arrest. In my professional judgment, no further interviews were necessary.
>
> I did not contest the DEA lab results showing that the substance Mr. Villagra imported was heroin. Mr. Villagra never challenged that fact and never asked me to do so.

(Document No. 36, Attachment A, pp. 4-6). Because Villagra-Montalvan has not established the

counsel was deficient for failing to investigate, pursue a motion to suppress, contact unnamed

witnesses or challenge lab results, and that such failures prejudiced him, no relief is available on

this ineffective assistance of counsel claim.

Villagra-Montalvan next argues that his attorney was ineffective for failing to object to

inaccuracies in the PSR, object to the PSR, and seek a reduction based upon minimal participation. Villagra-Montalvan's claim is unpersuasive given that counsel filed written objections to the PSR and a Sentencing Memorandum (Document No. 10),[5] and re-urged the objections at the Sentencing Hearing. (Sentencing Transcript, Document No. 27, pp. 3-5, 6-7; Document No. 10, p. 2).

> Ms. Wilson: Well, Your Honor, I understand the probation officer has responded he doesn't believe it's appropriate in this case; but there is certainly nothing in 3B1.2 that precludes a person in Mr. Villagra's situation from getting that discount. I think this case is perhaps unique from some others in that Mr. Villagra had a safety valve debriefing with the agents in this case in which he was able to describe where he went to pick up this package. He gave the names of the people he picked them up from. He doesn't know a whole lot about their operations, but he has some speculation with a bit of basis in fact that these people are probably importing drugs from Colombia to Nicaragua and then to other points.
>
> So, on the basis of fact that the guidelines don't preclude the discount and the fact of Mr. Villagra's position, I think that either minimal or some sort of minor role adjustment is supported by the facts of the case.

_____

[5] Villagra-Montalvan objected to factual inaccuracies and objected to his not being given a four-level downward adjustment for his role in the offense. Villagra-Montalvan wrote:

> The defendant is entitled to four-level minimal participant adjustment pursuant to U.S.S.G. § 3B1.2. Application note 2 states that a minimal participant adjustment is appropriate "in a case where an individual was recruited as a courier for a single smuggling transaction involving a small amount of drugs." This is such a case. In addition, the defendant admitted his participation to federal agents at a safety valve debriefing. He has been enthusiastic in his desire to have the other responsible parties brought to justice. However, this is unlikely because they reside in Nicaragua, and although the DEA has agents in Nicaragua, it is unlikely that they will investigate the leads the defendant provides.
>
> As indicated in the PSR and by the documents submitted with this memorandum, the defendant has not prior convictions and has never been involved in drug trafficking before. (Document No. 10).

In addition, this case is somewhat unique in the sense that with most importation cases, we don't know that much about the defendant. They come in from another country, they have no status in the United States, we are not able to contact their family.

In this case, I have had extensive contact with Mr. Villagra's family. In fact, I talked to his brother and mother this morning. I have submitted plenty of documentation to show that Mr. Villagra is what he said he was; he's a musician; he plays in a band with his brothers; numerous items from various agencies, the national police, the judge in Masaya showing this man has no criminal history, and that he is a person of high morals.

And so, I think that unlike other cases where we don't have the information and we don't know whether this person has been involved before and we don't know their role in the offense, I think we have some documentation here and some fairly high-standing people in Nicaragua saying that he has not been in this kind of trouble before.

I think on those unique facts, a discount is warranted. The guidelines make clear that a minimum participant discount should be rarely given. I have never got one. I think this case is somewhat unique.

Mr. Cook: The government's opposed to the downward adjustment, Your Honor. As Ms. Wilson points out, Footnote or Application Note 2 to 3B1.2, mitigating role states, it is intended that the downward adjustment for a minimal participant will be used infrequently.

It goes on to state that in a case where an individual was recruited as a courier for a single smuggling transaction involving a small amount of drugs, it may be warranted. All circuits addressing this, Your Honor, have stated that it is not an entitlement to that automatically as a courier; that it depends on certain factors.

In this case, Your Honor, the defendant is accused of smuggling approximately four kilos, 3,945 grams, just short of four kilos, Your Honor. The street level -- the value of this is approximately $60,000. And I have a witness in the courtroom, an agent who can testify to this, or I can tell you myself, Your Honor, $60,000 a kilo for $240,000 wholesale, and approximately $2.4 million street level value.

It also addresses in the footnote for the small amount of 27 heroin seizures at the airport last year where this case occurred, it was the largest amount of heroin seized by customs [at] the airport. The next closest one was 2,135 grams, almost half of this one.

For those reasons, the government does not feel the defendant meets the criteria nor should he be considered a minor or a minimal participant in this transaction.

Ms. Wilson: Well, Your Honor, I don't have any factual dispute to the government's numbers on what heroin is worth. In this case, I think an awful lot of the cases that come through the airport are swallowers, and that probably accounts for the relatively low quantity; that's just the limit of the human body. But in this case the drugs were secreted in the bottom, a false bottom of a bag.

I think something to keep in mind about a minor or minimal role is that the person who is carrying doesn't have control over the quantity. I understand that the guidelines are tied to quantity, and that's a decision of the Sentencing Commission, and I am not challenging that; but what I am saying is that in some cases where the defendant is able to show that he has a minor role in an offense, perhaps then the quantity should effectively be somewhat mitigated by a discount. If they had loaded up that bag with a little bit less of heroin, this man would be two levels lower in the guidelines, so, it's kind of arbitrary.

And I think that in this case we have facts showing that this is an otherwise fine, upstanding citizen. There are other family circumstances. His mother has liver cancer and has five months to live. We can't do anything about that. He won't be out in five months. But what I am saying is that given the information that we have about this person, this is one of those rare cases where I think the Court should give a small discount.

Court: I don't think that his being a fine person, which he probably is, really should go to whether he is a minimal or a minor participant or not, that rather should go perhaps to where he lands in the guidelines range. So I am not hearing anything that tells me he was a minor participant, that he deserves a role adjustment, so I am going to deny your motion. (Sentencing Transcript, Document No. 27, pp. 4-8).

In addition, Villagra-Montalvan's counsel has responded to his allegations concerning the calculation of his sentence in the PSR as follows:

> On February 28, 2001, I filed objections to the PSR clarifying factual inaccuracies in the report. In addition, I requested a four-level downward adjustment pursuant to USSG § 3B1.2, arguing that Mr. Villagra was a minimal participant. Attached to the objections were approximately eighteen documents that I had translated from Spanish. The documents included letters sent to me by Mr. Villagra's family in Nicaragua, and by his common law wife, Veronica Cortez, in Miami. I also attached family photographs. The purpose of attaching these photographs and documents to the objections was to convince the court that Mr. Villagra had no prior contact with the criminal justice experience, that he was a fine, upstanding citizen who had used poor judgment in one instance, and that he deserved a mitigating role adjustment. Nonetheless the court denied the mitigating role adjustment.

> Immediately after sentencing, I spoke with Mr. Villagra privately. I advised him that it was unlikely that the Court of Appeals would grant him a minimal participant adjustment if he appealed. Mr. Villagra said that he did not wish to appeal the case. Therefore, I did not file a notice of appeal. (Document No. 36, Attachment A, pp. 6-7).

Because Villagra-Montalvan has not established that his counsel was deficient for failing to object to the PSR and that such failure prejudiced him, no relief is available on this ineffectiveness claim.

## IV.    Conclusion and Recommendation

Based on the foregoing, the Magistrate Judge

RECOMMENDS that Movant Francisco Jose Villagra-Montalvan's § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No. 30) be DENIED, and the United States' Motion to Dismiss (Document No. 36) be GRANTED.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record. Within 10 days after being served with a copy, any party may file written

25

objections pursuant to 28 U.S.C. § 636(b)(1)(C), Fed. R. Civ. P. 72(b), and General Order 80-5, S.D. Texas. Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Ware v. King*, 694 F.2d 89 (5th Cir. 1982), *cert. denied*, 461 U.S. 930 (1983); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982) (en banc). Moreover, absent plain error, failure to file objections within the ten day period bars an aggrieved party from attacking conclusions of law on appeal. *Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1429 (5th Cir. 1996). The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77028.

Signed at Houston, Texas, this 9th day of September, 2004.

Frances H. Stacy

FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE